UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

KENNETH EDWARD CHANCE, JR.,

      Plaintiff,

v.                           Case No. 2:08-cv-01156

JIM RUBENSTEIN, Commissioner, West Virginia
Division of Corrections, CHARLENE SOTAK,
Inmate Grievance Coordinator, West Virginia
Division of Corrections, DAVID BALLARD,
Warden, Mount Olive Correctional Complex,
WEST VIRGINIA DIVISION OF PURCHASING[1],
WEXFORD HEALTH SOURCES, INC.,
PILAR OBENZA, as Executrix and
Personal Representative of the Estate of
DR. EBENEZER OBENZA, M.D.,and
DR. SUHBASH GAJENDRAGADKAR, M.D.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court are the following motions: a Motion for Summary Judgment filed by defendants Wexford Health Sources, Inc., Dr. Subhash Gajendragadkar, and Pilar Obenza, as Executrix and Personal Representative of the Estate of Dr. Ebenezer Obenza (ECF No. 131), a Motion for Summary Judgment filed on behalf of the Estate of Dr. Ebenezer Obenza For the Period of October 7, 2006 to

---

[1] The undersigned previously filed a Proposed Findings and Recommendation ("PF&R") recommending that summary judgment be granted to the West Virginia Division of Purchasing (ECF No. 112). That PF&R is pending before the presiding District Judge.

May 1, 2008[2] (ECF No. 133), and a Motion for Summary Judgment filed by defendants Jim Rubenstein, Charlene Sotak, and David Ballard (ECF No. 136).  This matter is assigned to the Honorable David A. Faber, Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

The following claims as alleged in the plaintiff's First Amended Complaint (ECF No. 55) are pending before the court:

1.   Whether Commissioner Jim Rubenstein, Warden Ballard and Charlene Sotak were/are deliberately indifferent to plaintiff's serious medical needs by issuing a contract to Wexford Health Sources, Inc. [hereinafter "Wexford"], and by failing to provide for proper oversight of Wexford.

2.   Whether Dr. Obenza, [Dr. Gajendragadkar], Wexford, Rubenstein, Sotak and Ballard were/are deliberately indifferent to plaintiff's urinary tract blockage, during the period of October 7, 2006 to the present (as to Wexford, the relevant time period is May 1, 2008, to the present).

3.   Whether Dr. Gajendragadkar, Dr. Obenza, Wexford, Rubenstein, Sotak and Ballard were/are deliberately indifferent to plaintiff's neurological/spinal problems and his need for an MRI of plaintiff's lumbar spine during the period of October 7, 2006, to the present (as to Wexford, the relevant time

---

[2]   During this time period, Dr. Obenza was employed by Correctional Medical Services, Inc., the former contracted medical provider at MOCC, who is not a defendant herein.  Accordingly, Dr. Obenza's estate is represented by separate counsel with regard to the allegations made concerning the plaintiff's medical treatment during that time period.

period is May 1, 2008, to the present).

4.    Whether Dr. Gajendragadkar was/is deliberately
      indifferent to plaintiff's serious medical need by
      failing to prescribe Neurontin and by allowing the
      prescription for it to expire.

## PLAINTIFF'S REMAINING ALLEGATIONS

The plaintiff's First Amended Complaint contains several claims alleging that the defendants have exhibited a deliberate indifference to the plaintiff's serious medical needs, in violation of his Eighth Amendment rights.   The remaining claims in the plaintiff's First Amended Complaint allege that the plaintiff suffers from a urinary tract blockage and spinal and neurological problems.   The plaintiff's First Amended Complaint alleges facts about medical issues dating back to 1988, when he claims that his urinary tract problems began.   (# 55 at 9, ¶ 1).   The plaintiff further alleges that, in 1997, the plaintiff injured his lower back when standing up from sitting in a plastic chair in his cell at MOCC.   (Id., ¶ 2).

The plaintiff then alleges that, in October of 1998, his right leg "gave out" as he got out of bed to use the bathroom.   The plaintiff claims that he had no motor control over his foot and that it was numb to the touch.   According to the First Amended Complaint, the plaintiff was seen by a Correctional Medical Services, Inc. ("CMS") doctor (who is not a defendant herein), but no diagnosis was made.   (Id., ¶ 3C).   The plaintiff further states:

3

> Within a period of time Plaintiff regained motor control,
> but the top of the foot was dead to touch sensation (and
> still is), additionally, the calf muscle was drawn tight
> causing Plaintiff even to this day, to have to slowly
> bring weight down when first getting out of bed or
> sitting for extended periods of time to stretch the calf
> muscle, and occasionally Plaintiff has problems lifting
> the foot.

(Id., ¶ 3B).

The plaintiff further claims that, in October of 2000, his
entire genital region went numb.  At that time, the plaintiff was
seen by another physician employed by CMS (who is also not a
defendant herein), but no cause for the numbness was determined and
no treatment was prescribed.  The plaintiff alleges that he
continues to suffer from this numbness whenever he lies down.
(Id., ¶ 4).

According to his First Amended Complaint, the plaintiff has
been seen by several urologists over the years.  On January 31,
2006, Dr. Jose Serrato performed a retrograde urethrogram and
determined that the plaintiff's "urethra tapers to an apparent
point of virtual occlusion at roughly the distal portion of the
prostatic area.  There is apparently a stricture at this site."
(Id., ¶ 6). The plaintiff further states, however, that Dr. Serrato
performed a surgical dilation on the plaintiff on September 18,
2006, and informed the plaintiff that he did not have a stricture,
but rather suffered from an enlarged prostate.  (Id. at 10, ¶ 6A).
The plaintiff was prescribed medication, which the plaintiff states
has relieved "some" of the painful symptoms, but is not relieving

4

the actual urinary tract blockage.  (Id., ¶ 6B).

The plaintiff has also been treated by another urologist, Dr. Julio Davalos.[3]  The plaintiff's First Amended Complaint alleges that, on or about February 20, 2008, Dr. Davalos, who had concluded that the plaintiff did not have an enlarged prostate, wrote a letter to the medical provider at MOCC (at that time it was CMS) and stated that an MRI of the plaintiff's spine might be necessary to address his complaints of lower back pain.  (Id., ¶ 7A-C). Wexford Health Sources took over the medical treatment of inmates at MOCC on or about May 1, 2008.

The plaintiff's First Amended Complaint further alleges:

> With no actual diagnosis of what the serious medical condition was with Plaintiff's urinary tract, Plaintiff pursued attempts to have an MRI done on his lumbar spine, to which defendant Obenza informed Plaintiff that Wexford *does not do MRI's*," which prompted Plaintiff to file grievance # 08-MOCC-OAK-197, wherein Plaintiff recounted the history of this serious medical condition; defendant Obenza went as far as to tell Plaintiff that if the MRI showed that Plaintiff needed surgery, such would only leave Plaintiff in more pain than he was already experiencing; the Level 1 response was that Plaintiff had been sent *off-site* for all tests recommended, and the MRI was not indicated at this time; Level II, defendant Ballard affirmed the unit response and denied the grievance; Level III, defendant Rubenstein by defendant Sotak affirmed defendant Ballard's decision and denied the grievance seeking diagnostic testing of the MRI.

(Id., ¶ 7D).  The plaintiff's Complaint also alleges that, starting in July of 2008, he has had several incidents of loss of bladder

---

[3]   The plaintiff used the spelling "Davalous" in his documents.  The undersigned will correct the spelling where necessary.

5

control during sleep.  (Id. at 10-11, ¶¶ 7E and 8).

In his discussion of his neurological and spinal problems, the plaintiff summarizes the facts on these claims as follows:

> Since on or about October 3, 1998, Plaintiff began suffering from various parts of his body going numb for various amounts of time, some never recovering; since the beginning of this undiagnosed condition, none of the contracted medical vendors at the MOCC, including the present Wexford, have conducted diagnostic testing upon Plaintiff to determine what is causing this condition, and to therefrom provide appropriate treatment and proper medical care for such.

(Id. at 15, ¶ 1).

The plaintiff repeats his allegations about his right leg "giving out" in October of 1998, and the continued numbness in his foot.  (Id., ¶¶ 2A-C).  The plaintiff then alleges:

> While it is unknown if such is directly related, between 2004-05, Plaintiff was diagnosed with Peripheral Arterial/Vascular Disease (PAD); when first diagnosed the condition was treated with the medication Pletal, but defendant Obenza discontinued the medication with no explanation; [FN 1 - it was a fairly expensive non-formulary drug] hair loss of the lower right leg (calf) has worsened, as well as neurological impairment of touch sensation from waist down, leg frequently burns when walking and at rest, and the leg become very heavy when walking up steps, and presently is not being treated.

(Id., ¶ 2D).  The plaintiff then alleges that he was seen by Pain Specialist Dr. H.S. Ramesh, in April of 2007, who prescribed Cymbalta for the plaintiff.  Subsequently, Dr. Obenza prescribed Neurontin as an alternative.  (Id., ¶ 2E).

The plaintiff further states that, at first, he was prescribed a dosage of 300 mg. of Neurontin three times a day, and that Dr.

Suhbash Gajendragadkar increased the dosage to 800 mg. three times a day.  The plaintiff further states that "the Neurontin was providing moderate relief to the painful neuropathy pain which Plaintiff suffers from daily/nightly." (Id., ¶ 2F).

The plaintiff's First Amended Complaint further asserts that the abrupt cessation of Neurontin can cause seizures. (Id.)  The plaintiff then alleges that, in late December of 2008, Dr. Gajendragadkar allowed the plaintiff's Neurontin prescription to expire without renewal, and that he filed two grievances over this issue, which were denied at all three levels of the grievance process. (Id., ¶¶ 2G-H).  Although his prescription was subsequently renewed, the plaintiff states that he learned that Wexford was removing Neurontin from its formulary.  The plaintiff further alleges that, after his Neurontin prescription again expired, Wexford has not provided a replacement drug. (Id. at 16, ¶ 2I).

The plaintiff's First Amended Complaint further alleges that in March of 2009, he has again filed several grievances about the Neurontin prescription being allowed to expire, about being denied other pain medication or other treatment for his neuropathy, and stated that those grievances were denied at all three levels of the grievance process. (Id., ¶¶ 2J-L).  The plaintiff also states that he filed a grievance over Wexford and Dr. Gajendragadkar's refusal to refer him to a pain specialist. (Id., ¶ 2M).  The plaintiff

also alleges that Dr. Ganjendragadkar temporarily placed him back on Neurontin, only to wean him off of it again, which the plaintiff has described as "outright torture" because he was given moderate relief, and then again has had slowly increasing pain.  (Id., ¶ 2N).

According to the First Amended Complaint, the plaintiff was seen by a Dr. Paul by teleconference on April 27, 2009.  (Id., at 16-17, ¶ O).  The plaintiff then had an in-person appointment with Dr. Paul on May 21, 2009.  At that time, Dr. Paul prescribed 300 mg. of Neurontin three times a day for the plaintiff, building up to 600 mg. three times a day, within a few days, and recommended a follow-up visit in approximately six months.  (Id. at 17, ¶ P).  Although the First Amended Complaint did not address whether the plaintiff was subsequently treated with Neurontin or any other pain medication, in his Response brief, the plaintiff mentions having been prescribed "Elavil" by Dr. Lauder, but asserts that it has not provided sufficient relief.  (ECF No. 141 at 8).

Generally, the plaintiff's deliberate indifference claims can be boiled down into two issues:  that Wexford, through its doctors, Dr. Obenza (who also worked for CMS prior to May 1, 2008) and Dr. Gajendragadkar, have failed to refer the plaintiff to outside specialists for an MRI and other diagnostic testing, and that they have failed to adequately diagnose and treat his various conditions with effective medication.

8

Before addressing the merits of the plaintiff's deliberate indifference claims, the undersigned notes that, as addressed in the previous Proposed Findings and Recommendation ("PF&R") addressing the claims against the medical and DOC defendants, to the extent that the plaintiff has alleged claims against Wexford Health Sources, those claims may only concern the plaintiff's treatment since May 1, 2008, when Wexford took over the contract to provide medical services to inmates at MOCC.  Furthermore, to the extent that the plaintiff's First Amended Complaint contains factual allegations that pre-date May 1, 2008, the claims against the health care providers would only concern defendant Obenza, who was employed as a doctor at MOCC prior to Wexford's contract date. Moreover, any allegations about events that occurred prior to October 7, 2006, are barred by the two-year statute of limitations applicable to section 1983 claims.[4]

## **STANDARDS OF REVIEW**

**A.    Summary Judgment.**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

---

[4]  The plaintiff's original Complaint was filed on October 7, 2008.  (ECF No. 2).

Fed. R. Civ. P. 56(a).

Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).  If the moving party meets this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Celotex, 477 U.S. at 322-23.

Rule 56(c)(1) discusses the information that may be considered to support the factual positions of the parties.  The rule states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers or other materials; or

> (B) showing that the materials cited do not
> establish the absence or presence of a genuine
> dispute, or that an adverse party cannot
> produce admissible evidence to support the
> fact.

Fed. R. Civ. P 56(c)(1).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

**B.   Deliberate indifference under the Eighth Amendment.**

In Farmer v. Brennan, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" Id., at 833.

11

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." Id., at 834. (Citations omitted.)  The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found
> liable under the Eighth Amendment for denying an inmate
> humane conditions of confinement unless the official
> knows of and disregards an excessive risk to inmate
> health or safety; the official must both be aware of
> facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also
> draw the inference.

Id., at 837.

"In order to state a cognizable claim for denial of medical care under the Eighth Amendment, an inmate must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see also Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases).

12

"Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. <u>Gaudreault v. Munic. of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990). The undersigned notes that the presiding District Judge previously determined that "the conditions at issue - manifested by inability to urinate followed by loss of bladder control, chronic severe pains, shooting pains and numbness - are objectively serious medical problems by Eighth Amendment standards." (ECF No. 68 at 9). Accordingly, the undersigned will not re-address that element herein, and will consider it to have been met as to each of the plaintiff's remaining claims.

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. <u>See</u> <u>Benson v. Cady</u>, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. <u>See</u> <u>id.</u> Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. <u>See</u> <u>Estelle</u>, 429 U.S. at 106.

<u>Miltier</u>, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need by correctional officials and health care providers is very high. It is well settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. <u>See</u> <u>Farmer</u>, 511 U.S. at 832-35; <u>Sosebee v. Murphy</u>, 797 F.2d

13

182-83 (4th Cir. 1986); Loe v. Armistead, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

Rush v. VanDevander, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); Banks v. Green Rock Correctional Center Medical Dept., 2007 WL 2903673 (W.D. Va., Oct. 3, 2007).  For example, in Sosebee, the Fourth Circuit found that if prison guards were aware that a steak bone had pierced an inmate's esophagus, causing infection that resulted in the inmate's death, and the guards had intentionally abstained from seeking medical help, such conduct might establish deliberate indifference to a serious medical need.

In Webster v. Jones, 554 F.2d 1285 (4th Cir. 1977), the plaintiff, who had complained numerous times of eye problems and loss of vision, claimed that he was cursorily examined after his initial complaint, but never re-examined despite later complaints. The doctor claimed that he examined Webster several times, but never diagnosed a medical problem with his eye.  Id. at 1286. Subsequently, a specialist found that Webster's vision had deteriorated to 20/400 and that he suffered from a detached retina and iritis, and that his vision could not be restored.  Id.  The Fourth Circuit found that, even if the doctor had been negligent in failing to properly diagnose or treat Webster, negligence is not sufficient to demonstrate deliberate indifference to a serious medical need and, thus, Webster's allegations did not constitute a cognizable constitutional claim.  See also, Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

14

Likewise, disagreements between a health care provider and the inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).  As noted by the Fourth Circuit, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate.  Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977).

Using these standards, the undersigned will now turn to a discussion of the plaintiff's claims of deliberate indifference and the defendants' motions for summary judgment thereon.

## ANALYSIS

### A.   The plaintiff's claims concerning urinary blockage.

The plaintiff has alleged that Dr. Obenza[5], Dr. Gajendragadkar and Wexford were deliberately indifferent to his serious medical needs regarding a urinary blockage by failing to prescribe medications intended to shrink an enlarged prostate.  Dr. Obenza's Motion for Summary Judgment concerning the time period of October 7, 2006 to May 1, 2008 states as follows:

---

[5]   Because of the death of Dr. Obenza, his estate and his wife, as executrix and personal representative thereof, have been substituted as the party defendant.  For ease of reference, however, the undersigned will refer to this defendant as Dr. Obenza.

15

Plaintiff's discovery responses indicate that urologist Dr. Serrato performed a CT scan and a retrograde urethrogram as diagnostic tests in 2005. The medical record (*See* Exhibit 5) shows that he was actually seen on July 17, 2006 by a urologist Dr. Serrato at CAMC. Dr. Serrato's examination and diagnostic testing was performed in an effort to treat the urinary blockage. Dr. Obenza took the consultation into account in his treatment of the plaintiff.  Dr. Serrato prescribed Hytrin.  In addition to providing medication, Dr. Obenza ordered laboratory studies including a urinalysis, urine culture, CBC, ESR and PSA (prostate specific antigen) on December 3, 2007.  (*See* Exhibit 6).

The plaintiff admits he was referred to a urologist, Dr. Julio Davalos.  The medical record proves that on February 20, 2008, Dr. Davalos specifically recommended that the patient "continue Hytrin."  (*See* Exhibit 7). That referral was made by Dr. Obenza in a further attempt to treat plaintiff's urinary tract blockage.  Dr. Obenza requested a urodynamic study on the next day (*See* Exhibit 8) which was a test suggested by Dr. Davalos.  The urodynamic study is performed to determine if the patient has a weakened bladder.

Exhibit 9 is a memo written by the plaintiff on November 2, 2009 complaining about Dr. Gajendragadkar and Wexford's treatment of his urinary blockage.  In that document, plaintiff provides his own history of his condition and admits that Dr. Serrato first prescribed Hytrin to him.  The record proves that Dr. Davalos also prescribed Hytrin.

Plaintiff's entire complaint against Dr. Obenza is that he prescribed Hytrin and did not prescribe medications to shrink the prostate.  Plaintiff has admitted that Hytrin was prescribed by two (2) urologists who examined the patient and performed extensive diagnostic studies.

Plaintiff has admitted in his Supplemental Answers to Interrogatories (*See* Exhibit 3) that he will call no physician to testify at trial that some medication other than Hytrin was a medical necessity.  Plaintiff has developed no evidence to support his claim that Dr. Obenza was deliberately indifferent to his serious medical needs.  Plaintiff has wholly failed to produce

16

any evidence to support his claims.

(ECF No. 135 at 2-5).

The Memorandum of Law in support of the Motion for Summary
Judgment filed collectively by Dr. Obenza, Dr. Gajendragadkar and
Wexford (hereinafter "the medical defendants") concerning the
plaintiff's treatment after May 1, 2008 states in pertinent part:

> Even though the Magistrate Order does not list Dr.
> Gajendragadkar as a defendant with reference to
> plaintiff's claim of deliberate indifference as to his
> "urinary tract blockage," Dr. Gajendragadkar did provide
> care and treatment for that condition as set forth in his
> Affidavit. The Affidavit also refers to portions of the
> medical records of Mr. Chance. The records of Mr. Chance
> while at the Mount Olive facility exceeds several hundred
> pages. The Affidavit seeks to use representative samples
> thereof to show that there is [sic; are] no undisputed
> facts as to the level of care received by Mr. Chance for
> the three different issues outlined above.

> The Affidavit of Dr. Gajendragadkar and the
> medication administration record attached thereto show
> that during the month of May 2008, the plaintiff had
> prescription orders for over twenty (20) medications to
> be administered during that month. Included within that
> list are Terazosin HCL which is medication prescribed for
> the treatment of symptoms of enlarged prostrate [sic;
> prostate], which symptoms can include difficulty
> urinating, painful urination and urinary frequency and
> urgency. He was also receiving Doxycycline, an
> antibiotic for possible infection.

> A year later, in May 2009, he was still prescribed
> Terazosin HCL. In addition, a prescription had been
> given to him for Sulfasalazine, which is a drug to treat
> symptoms of digestive tract problems, as well as an anti-
> inflammatory agent. In addition, he was prescribed
> Hyomax-SL, a medication for stomach and intestinal
> problems and is also used to treat bladder and bowel
> control problems.

> The medication and administration record for August
> 2010, shows that Mr. Chance was prescribed Cardura which

17

also treats symptoms including urinary difficulties.

> Mr. Chance's treatment was not limited to medication. Throughout the years, he has received various laboratory testing. Exhibit 3 of the Affidavit are copies of some of the lab work. These records show that he received testing results on September 25, 2008, May 29, 2009, November 25, 2009, November 27, 2009, December 3, 2009, December 31, 2009, April 28, 2010, May 1, 2010, August 20, 2010, October 1, 2010, and October 8, 2010. As reports reveal, these tests were performed for a variety of reasons and upon blood and urine.

> In addition to the medication and testing, Mr. Chance was examined on periodic occasions by Dr. Gajendragadkar and Dr. Obenza. In addition, he was seen outside the facility by various specialists relating to urology and has received various diagnoses and recommendations concerning his complaints.

(ECF No. 132 at 3-5).

The plaintiff's Response to the Motions for Summary Judgment addresses the medical defendants' treatment of his urinary blockage issue as follows:

> There is first a question of fact as to which diagnosis is to be accepted since the urologists cannot even basically agree with what is wrong with Plaintiff. Second there is the issue of whether *doggedly pursuing known ineffective course of treatment*, namely medication which has proven it is not in any way helping or alleviating serious symptoms constitutes medical treatment, or none as Plaintiff asserts. It cannot be argued that various medical personnel have not caused Plaintiff to be seen by specialists, being Urologists. However, with no consensus as to what is actually wrong with Plaintiff, the only reasonable thing that can be done is to try the various medications. For many years now Plaintiff has went [sic; gone] through the various medications of Flomax, Cardura (twice), Hytrin, at varying doses for long terms, none of which have provided any relief. As set forth below, the notation of Dr. Davalous [sic; Davalos] that Hytrin was providing some relief to Plaintiff is in error, as Dr. [Davalos] must have misunderstood the answer to any question relative to

18

> the history of this condition, as no medication thus far
> provided has provided ANY TYPE of relief.  The only two
> remaining medications to be tried are ones that shrink an
> enlarged prostate, being Avodart and PROSCAR.

(ECF No. 141 at 2).

The plaintiff denies that his claim is merely a disagreement between himself and the medical defendants as to the course of treatment.  (Id.)  The plaintiff claims that the defendants are "completely unwilling to change medication" to the suggested drugs that "actually shrink an enlarged prostate" and that they have "doggedly pursued" ineffective treatment by continuing to give him medications that have not provided him with relief.  (Id. at 2-3).  The plaintiff then sets forth in great detail the testing and treatments suggested and provided by each of his treating specialists, and then sets forth an explanation of why he believes he should be treated with these other medications.  (Id. at 3-4).

The plaintiff then suggests a completely new hypothesis for his symptoms: he suggests that he may be suffering from chronic kidney failure, and points out that he only has one kidney, after having lost his right kidney to cancer at the age of seven.  (Id. at 4-6).  The plaintiff suggests that the laboratory test results indicate that his Creatinine levels are at the high end of the acceptable range.  (Id. at 6).  The plaintiff's Response further states:

> Insofar as the medical defendants are sued, the
> primary contention with this condition is indeed about
> not pursuing available medication options, which

19

> Plaintiff believes that all of the time that the other
> medications have been taken and providing no relief, that
> it should be obvious that deliberate indifference claims
> are established by the flat refusal to try medications
> which shrink an enlarged prostate when even defendant
> Gajendragadkar accepts that Plaintiff has an enlarged
> prostate, so it should be obvious that a medication which
> shrinks an enlarged prostate is medically indicated when
> other medications fail to provide relief otherwise.

(Id. at 6-7).

Dr. Obenza, by his counsel representing him on the claim
concerning his conduct between October 7, 2006 and May 1, 2008,
filed a Reply brief further addressing this issue.   The Reply
asserts that there is no evidence from which a reasonable jury
could conclude the Dr. Obenza was deliberately indifferent to the
plaintiff's serious medical needs.   The Reply further states:

> Plaintiff admits that he was referred by Dr. Obenza
> to a urologist, Dr. Jose Serrato in 2006.   Dr. Serrato
> treated the plaintiff with medications (Cardura and
> Hytrin) and performed a Retrograde Urethrogram and later
> in 2006 he performed a surgical dilation of the urethra,
> cystoscopy,   panendoscopy,   bilateral   retrograde
> pyelograms.   (See attached Plaintiff's Response p. 3).
> Plaintiff admits he was referred by Dr. Obenza to a
> second urologist Dr. Julio Davalos.   The plaintiff does
> not dispute that Dr. Davalos performed three diagnostic
> tests over two appointments in an effort to determine the
> cause of the urinary blockage.   The plaintiff admits that
> Dr. Davalos concluded that the plaintiff did <u>not</u> have an
> enlarged prostate.
>
> The undisputed and admitted record in this case is
> that Dr. Obenza did prescribe appropriate medication for
> the treatment of this patient.   Dr. Obenza referred the
> patient   to   two   specialists   in   Urology   and   those
> specialists performed numerous surgical procedures and
> diagnostic   tests   to   determine   the   cause   of   the
> plaintiff's condition and the appropriate treatment.   The
> undisputed fact is Dr. Obenza prescribed Hytrin, the same
> medication prescribed by both urologists who treated this

patient.  There is no evidence in the record of this case
from which a reasonable trier of fact could find that Dr.
Obenza was deliberately indifferent to the serious
medical needs of the plaintiff during the period of
October 7, 2006 to May 1, 2008.   The Response of the
plaintiff to the Motion for Summary Judgment does not
present any evidence or make a serious argument which
would defeat the Motion for Summary Judgment.
Plaintiff's Response makes it clear that his actual
dispute is with the medication prescribed by the
physicians.   Plaintiff wants to substitute his own
judgment for the judgment of three physicians.
Deliberate indifference by Dr. Obenza is not proven by
any evidence in this case.

(ECF No. 144 at 2-3).

**B.**   **The plaintiff's claims re: neurological/spinal problems.**

The plaintiff's Amended Complaint also alleges that the
medical defendants were deliberately indifferent to plaintiff's
serious medical needs concerning neurological and spinal problems.
Specifically, the plaintiff claims that the medical defendants
refused to allow the plaintiff to have an MRI of his lumbar spine
and refused to continually prescribe Neurontin to the plaintiff for
pain.

The Memorandum of Law in support of Dr. Obenza's Motion for
Summary Judgment concerning the time period of October 7, 2006 did
not specifically address these claims.  (ECF No. 135).  However,
the Memorandum of Law filed collectively by the medical defendants
addresses the plaintiff's neurological/spinal problems and the
failure to approve an MRI as follows:

With respect to the neurological/spinal problems and
his perceived need for an MRI examination, Mr. Chance had
various complaints of pain related to his neck and back

21

throughout his stay at Mount Olive Correctional Complex. In addition to being examined repeatedly by the medical staff, he was prescribed several medications related to "neurological/spinal problems." During the month of May 2008, the medical administration record reveals that Mr. Chance had been prescribed Baclofen. This drug is a muscle relaxer and an anti-spastic agent. He was also prescribed Neurontin for pain control. During the month of May 2008, he was also prescribed Piroxicam, a non-steroidal anti-inflammatory drug used to treat pain or inflammation.

A year later in May of 2009, Mr. Chance began the month on prescriptions of Meloxicam, which is used for the treatment of tenderness, swelling and pain caused by inflammation. He still had a prescription for Baclofen, the muscle relaxant. He was also prescribed Sulfasalazine which is also an anti-inflammatory agent. In the later part of May 2009, he received another prescription for Neurontin.

In August 2010, Mr. Chance was still being prescribed Baclofen and Meloxicam.

In addition to the laboratory work previously mentioned, Mr. Chance also received an MRI on September 25, 2009, at Montgomery General Hospital. The radiologist report is attached to the Affidavit as Exhibit 4. The MRI results show that Mr. Chance's complaints were not caused by a "bulging" disc, as contended by Mr. Chance. The disc bulge seen on the MRI is non-compressive. These results would not justify any surgery for Mr. Chance. Dr. Gajendragadkar has stated that the results of the MRI confirmed that an MRI had not been necessary for Mr. Chance and would not have aided in his treatment.

In addition to the aforesaid treatments, Mr. Chance received at least a chest x-ray on December 3, 2009, and on May 28, 2009. He also received a chest x-ray on May 15, 2010. In addition to the x-rays, Mr. Chance has received Spirometry tests, copies of the tests of December 29, 2009, and July 26, 2010, are attached as Exhibit 10 to the Affidavit. Mr. Chance also received EKG's on July 1, 2009, December 3, 2009, and September 3, 2010. Copies of those results are attached hereto as Exhibit 11.

22

(ECF No. 132 at 5-6).

Concerning the failure to continually prescribe Neurontin, the medical defendants' Memorandum of Law states:

> Mr. Chance has alleged that the Wexford defendants were deliberately indifferent by failing to prescribe Neurontin and/or allowing his prescription to expire without medical justification. The facts clearly show that Mr. Chance was prescribed Neurontin from time to time during his time at Mount Olive.
>
> Neurontin is a medication originally developed to control seizures by epilepsy and post herpetic neuralgia in adults. It also has a secondary use as a medication to help control neuropathic pain. Mr. Chance was receiving Neurontin in May 2008, as shown on the medication and administration record for that time period.
>
> The FDA had only approved Neurontin for management of post herpetic neuralgia pain and had not approved the drug for management of chronic pain. As a result, Wexford discontinued the use of Neurontin as a long term pain reliever. As a result, Mr. Chance was taken off the medication. At the time he was taken off this medication, he was still receiving various medications including the muscle relaxants, anti-inflammatories and pain control medication listed above. In addition, he was prescribed Ultram for additional pain relief.
>
> Mr. Chance was informed on March 12, 2010, that Neurontin was not FDA approved to treat chronic pain and that is why it was not approved for renewal. Mr. Chance was periodically prescribed Neurontin beginning in May 2009, and has been taken on and off the medication over the months as it is not approved for long term chronic pain management. At all times during his time at Mount Olive after May 1, 2008, Mr. Chance has received medications for pain, anti-inflammatory control and muscle relaxants. His medication record for August 2010, previously attached to the Memorandum as a part of Exhibit 2 show that he was prescribed Meloxicam which treats tenderness, swelling and pain caused by inflammation, Baclofen a muscle relaxant and anti-spastic agent and Sulfasalazine, which is also an anti-inflammatory agent. All of these medications are

designed to provide pain relief to Mr. Chance.

As stated in the Affidavit of Dr. Gajendragadkar and as supported by the medical records attached thereto as Exhibits 8, 9, 10 and 11, Mr. Chance received various chest x-rays, Spirometry tests and EKG's in an attempt to provide him medical care for his symptoms.

(Id. at 6-7).

The medical defendants further address the plaintiff's overall

treatment, stating:

Finally, on September 25, 2009, an MRI of cervical and lumbar areas were taken at Montgomery General Hospital.  The MRI showed only mild kyphosis in the thoracolumbar junction. There was disc bulge seen at L5-S1.  However, it was shown to be non-compressive.  As stated by Dr. Gajendragadkar, this finding does not support a claim of a "bulging" disc which would require surgery or which would cause his extreme symptoms. There were no findings with reference to the cervical spine which would justify surgery. Accordingly, the MRI simply supported the Wexford defendants', including Dr. Gajendragadkar['s], opinion that an MRI was not medically necessary for Mr. Chance during the time period leading up to the filing of his Complaint.

In addition to medications, it is obvious that Mr. Chance has been examined on repeated occasions by the medical staff, including the Wexford defendants.  As a result of those examinations, medications were ordered, In addition, he has received a minimum of 11 laboratory screenings since May 1, 2008, through October 8, 2010. These screenings certainly are not indicative of deliberate indifference by the medical provider.

In addition to being treated with medications and laboratory results, Mr. Chance has also been ordered and has received x-rays including at least those received on May 28, 2009, December 3, 2009, and May 15, 2010.  He also received Spirometry tests on December 29, 2009, and July 26, 2010.  The Exhibits to the Affidavit also show that he received EKG's on July 1, 2009, December 3, 2009, and September 3, 2010.

24

In addition to these objective records of the extent of treatment received by Mr. Chance, Dr. Gakendragadkar has provided his testimony through his Affidavit that Mr. Chance received necessary and proper medical care and treatment for his "urinary tract blockage" and his "neurological/spinal problems." This medical testimony is and will remain uncontradicted.

(Id. at 11-12). The medical defendants' Memorandum further discusses the fact that the plaintiff refused to be placed in the prison's infirmary for several days of observation in August of 2009, and further refused an annual physical in May of 2010. (Id. at 13-14).

The plaintiff's Response to the medical defendants' Motions for Summary Judgment addresses his neurological/spinal problems as follows:

The first point of this condition is the obvious, being that there certainly must be a significant reason why body parts keep losing touch sensation, go completely numb, and in the first case in 1988, caused permanent damage to the right calf muscle and top of the right foot. Other body parts go numb for extended periods of time ranging weeks, and when sensation comes back it is impaired. It is unknown if this condition was the cause of loss of bladder control as set forth in the Amended Complaint, as the entire region was completely numb.

This condition has numerous symptoms to it, not merely loss of feeling. As stated above, whatever it is caused permanent damage to Plaintiff's right calf muscle in 1988. In 2000 the 3rd bout occurred in the groin/genital area and to this day Plaintiff has recovered only about 25% touch sensation to the skin. "Something" is causing nerve impairment, and since "nerves" control the entire body, most importantly the heart, lungs, etc., it seems to Plaintiff that this is a significant, life threatening condition which there should be a diagnosis to put to, so that an effective treatment can be started. The point that is of real concern to Plaintiff is not that any of these conditions

25

would take his existence, but the concern that impairment of nerves (and probable blood flow) could cause a stroke -- the concern of becoming an invalent [sic; invalid] from a stroke is Plaintiff's point.

There is also the painful aspect of this condition, from the shooting nerve pains which the Neurontin effectively dealt with. There are sufficient grievances on file in this matter to establish that the prescription for this medication was allowed to lapse various times exclusive of when defendants have taken it from Plaintiff. In one particular case, defendant Gajendragadkar actually days after he allowed the prescription to expire, renew[ed] it and on a tapered scale to take Plaintiff off of it. In one case where it was allowed to lapse, Oak Hall Unit Manager William Kincaid had an entry point in the Oak Hall, Pod 1 Log Book for staff to "watch" Plaintiff for any possible seizures, since abruptly stopping or discontinuing Neurontin can cause seizures. The nerve pain from this condition gets severe in nature and has caused Plaintiff's right leg to give out previously.

Counsel's statement [sic; Counsel states] that Plaintiff simply does not want to hear a medical reason for the discontinuation of the Neurontin. This is not true, as Plaintiff simply wants a medication that is an effective replacement to block the nerve pains, which nothing they have Plaintiff on or have tried beyond the Neurontin has worked. The "Elavil" has been raised twice since Dr. Lauder prescribed it to replace the Neurontin, and it is not enough to stop the pains, nor does it last 24 hours as it is only once a day. Medications are prescribed "off-label" when they are found to treat a different condition. Defendants have, in Plaintiff's opinion, simply latched onto "FDA labeling" to support their desire not to provide the non-formulary medication which will cost them more. Furthermore, there is Dr. Paul's statements to Plaintiff that he "NEEDS" the Cymbalta which Pain Specialist Dr. H.S. Ramesh prescribed for neuropathy pain, but since Plaintiff has Glascoma (sic; glaucoma) he cannot take Cymbalta so the Neurontin was the next best replacement.

(ECF No. 141 at 7-8).

The plaintiff's Response then attempts to explain his refusal to be placed in the infirmary for several days of observation in August of 2009 and his refusal to give a stool sample.  (Id. at 8-9).  The plaintiff further states:

> In that this condition has already been determined by the District Judge to be a serious medical condition, there is the obvious material fact that there is no diagnosis [that has] been made, and therefrom a determination of what the proper treatment for that serious medical condition would be.  Beyond the self-serving Affidavit by defendant Gajendragadkar, the Medical Issues of this §1983 are at the same posture that they were in when the motion[s] to dismiss were ruled upon.  Counsels have for the most part only recapped factual allegations within the Amended Complaint.

(Id. at 10).

The medical defendants also filed a Reply brief addressing the plaintiff's medical treatment after May 1, 2008.  The Reply states:

> The plaintiff has come forth with no evidence to support his claims against these defendants after May 1, 2008.  Despite the Affidavit of Dr. Gajendragadkar and the medical records with the Motion for Summary Judgment, the plaintiff offers nothing more than his opinions and disagreements with the medical treatment provided by these defendants.  In fact, it appears that Mr. Chance disagrees with just about every medical provider who has treated him.
>
> As predicted, Mr. Chance has provided excuses as to why he refused to be admitted to the infirmary as requested by Dr. Gajendragadkar.  However, these excuses ring hollow.  The fact remains, Dr. Gajendragadkar wished to admit the patient to a medical facility for observation to aid in the diagnosis and treatment of the patients [sic; patient's] condition.  The patient refused.  What is important is that Dr. Gajendragadkar did not treat Mr. Chance with deliberate indifference. Instead, he decided upon a course of conduct designed to facilitate the diagnosis of Mr. Chance's problems and the appropriate treatment therefore.  Dr. Gajendragadkar was

denied this opportunity by Mr. Chance.

Interestingly, the response of Mr. Chance reveals
that he has continued to receive treatment, diagnostic
procedures and testing related to his conditions.
Several pages of his response refer to matters which have
occurred since Dr. Gajendragadkar left the facility and
involve testing procedure performed by other physicians
employed by Wexford.  Of course, Mr. Chance either
disagrees or belittles the medical procedures used, the
test procedures used and the test results.  However, no
evidence is provided by Mr. Chance, other than his own
opinion, that there is any substandard care.  It is
obvious that Mr. Chance has never been faced with
deliberate indifference on the part of Wexford, Dr.
Gajendragadkar, Dr. Obenza or any other medical provider
he has seen.  He has encountered only medical providers
who are treating him according to their education,
training, experience and knowledge which is at odds with
Mr. Chance's opinion of the medical treatment he should
receive.  It should be clear that Mr. Chance will never
be satisfied with the medical treatment he receives.

(ECF No. 145 at 2-3).

Based upon a thorough review of the medical records that have
been provided by the parties, the Affidavit of Dr. Gajendragadkar,
and the plaintiff's discovery responses, the undersigned proposes
that the presiding District Judge **FIND** that the plaintiff has not
demonstrated that the medical defendants exhibited deliberate
indifference to his serious medical needs.  As noted by the medical
defendants, the plaintiff has received a continuing course of
medical treatment, including an MRI and the prescription of
multiple drugs designed to treat the plaintiff's symptoms.  (ECF
No. 132 at 10).  The defendants further argue that "[i]t is almost
ludicrous for a person to claim they are being treated with
deliberate indifference to medical needs when they are receiving

prescriptions for nearly twenty (20) drugs to treat various symptoms, including multiple drugs for urinary and related problems, as well as multiple drugs for ease of inflammatory conditions and pain associated with neurological and muscular problems." (Id.)

The plaintiff has not demonstrated anything more than a disagreement with his medical providers concerning the appropriate treatment for his various medical conditions. The undisputed facts demonstrate that the plaintiff has been continuously examined by the medical personnel at MOCC, and by several outside specialists, that he has been given medications that had been prescribed or recommended by those specialists based upon their medical judgment, and that he did receive an MRI of his spine, which indicated that he had a non-compressive bulging disc that would not require surgical intervention.

Thus, the plaintiff has failed to show that the medical defendants have been deliberately indifferent to his serious medical needs. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact, and that the medical defendants are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claims.

**C.    The plaintiff's claims against the DOC defendants.**

Plaintiff has also asserted that defendants Rubenstein, Sotak, and Ballard ("the DOC defendants") have exhibited deliberate indifference to his serious medical needs by "failing to provide for proper oversight of Wexford, given its propensities for deliberate indifference to inmates['] serious medical needs" and "by not providing a provision for an independent medical expert to review records of any inmate asserting being denied adequate medical care for serious medical needs, in violation of the 8th Amendment." (ECF No. 55 at 7). The plaintiff's claims against the DOC defendants appear to be based entirely on the actions of those defendants in denying the plaintiff's grievances concerning his medical treatment.

Public officials, such as the DOC defendants, are not liable for monetary damages if they can show that their conduct did not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. See Wilson v. Layne, 526 U.S. 603, 609 (1999). Qualified immunity exists to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law." Doe v. Broderick, 225 F.3d 440, 446 (4th Cir. 2000).

In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged

show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id.* If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case. *Id.*

Furthermore, as noted by the DOC defendants, it is well-settled that prison officials are entitled to rely upon the professional judgment of trained medical personnel. *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). (ECF No. 137 at 4). Thus, to establish a claim of deliberate indifference against non-medical prison personnel, a plaintiff must demonstrate that the official was personally involved in the treatment or denial of treatment, or that they deliberately interfered with the treatment, or that they tacitly authorized or were indifferent to the medical provider's misconduct. *Miltier*, 896 F.2d at 853. (ECF No. 137 at 4).

The DOC defendants' Memorandum of Law in support of their Motion for Summary Judgment addresses the plaintiff's claims concerning the issuance of the medical contract as follows:

> The first complaint made by plaintiff pertains to the issuance of a medical contract to Wexford which plaintiff maintains engages in a pattern of conduct that exudes *per se* deliberate indifference towards inmates . . . . In addition, Defendants Rubenstein, Sotak, and Ballard are all mentioned as "failing to provide proper oversight of Wexford . . . by not providing a provision for an independent medical expert to review records[.]"

31

> The plaintiff has failed to develop any evidence to
> support this theory of recovery.  For instance, the
> plaintiff cannot demonstrate the substantial risk of
> serious injury that was presented by either issuing the
> contract with Wexford or failing to provide proper
> oversight by having an independent medical expert review
> records.  Moreover, the plaintiff has not established
> that the DOC defendants failed in any duty related to the
> awarding of the contract to Wexford, or that they were
> otherwise deliberately indifferent to Plaintiff's serious
> medical needs.  In sum, there is no legal authority or
> factual predicate upon which the plaintiff's theory of
> recovery in this regard can be properly based.  As such,
> summary judgment is appropriate.

(ECF No. 137 at 4-5).  Concerning the plaintiff's claims about his

urinary tract blockage, the DOC defendants state:

> The plaintiff's claim of deliberate indifference by
> the DOC defendants as to alleged problems with his
> urinary tract must fail for lack of proper evidence.
> Here, the plaintiff contends that Defendants Rubenstein,
> Sotak, and Ballard were deliberately indifferent to his
> medical needs by "failing to compel defendant Wexford to
> perform all needed diagnostic testing, including an MRI
> of Plaintiff's lumbar spine[.]" In this regard, the
> evidence clearly demonstrates that the plaintiff simply
> disagreed with his medical provider's diagnosis and
> course of treatment.  It is not reasonable to expect
> these defendants to second guess the judgment of the
> prison's medical personnel.  Their refusal to do so does
> not constitute "deliberate indifference." Indeed, as set
> forth more clearly in the Statement of Uncontested Facts
> incorporated by reference [from the medical defendants'
> Memorandum of Law (ECF No. 132)], the plaintiff received
> excellent medical care regarding this condition.  As
> such, summary judgment is appropriate.

(Id. at 5).

Finally, concerning the plaintiff's claims about his treatment

for his neurological and spinal problems, the DOC Defendants state:

> The plaintiff's claim that the DOC defendants were
> deliberately indifferent to his alleged neurological and

spinal problems fails for lack of evidence.  Here, the
plaintiff maintains that Defendants Rubenstein, Sotak,
and Ballard were "deliberately indifferent" by "failing
to compel defendant Wexford to have Plaintiff seen by the
appropriate medical specialist(s)[.]"  Here again, the
plaintiff simply has a disagreement with his treating
physician over the course of treatment that is being
provided.  Significantly, the plaintiff has not developed
one iota of evidence that these defendants either ignored
or left untreated his medical condition.    To the
contrary, as set forth more clearly in the Statement of
Uncontested Facts incorporated by reference [from the
medical defendants' Memorandum of Law (ECF No. 132)], the
plaintiff received excellent medical care regarding this
condition.  As such, summary judgment is appropriate.

(Id. at 5-6).

The plaintiff's Response addresses the DOC defendants' Motion

for Summary Judgment as follows:

The DOC defendants rely upon saying they are
entitled to rely upon the judgment of the Medical
Professionals, and to a degree Plaintiff agrees.
However, there exists the necessary question of, how far
does that deference go?  How many times does an inmate
have to make formal complaints to prison officials that
he has a serious medical condition, that what Medical
Personnel are doing isn't working, and that they won't
move on to alternatives?  This is a question which the
Court must answer.  At what point do the action or
inaction of prison officials upon repeated inmate
complaint before it become tacit authorization of
deliberate indifference by Medical personnel?  These
incidents are not isolated, but rather long term and
ongoing.

* * *

Plaintiff believes that his existing claims should
survive summary judgment.  There are genuine material
facts at dispute.  Perhaps the only question[] is whether
or not the DOC defendants are afforded qualified
immunity.

(ECF No. 141 at 10-11).

Because the undisputed facts demonstrate that Plaintiff has not sufficiently alleged deliberate indifference claims against the medical providers who treated him, he cannot sufficiently allege deliberate indifference claims against the DOC defendants, who were entitled to rely upon the professional medical judgment of the health care providers when reviewing Plaintiff's grievances concerning Plaintiff's treatment. Accordingly, the undersigned proposes that the DOC defendants should be accorded qualified immunity on Plaintiff's claims against them.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact concerning the DOC defendants' conduct surrounding Plaintiff's medical care and that defendants Rubenstein, Sotak, and Ballard are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claims.

<u>**RECOMMENDATION**</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motions for Summary Judgment filed by Defendants Dr. Ebenezer Obenza, Dr. Subhash Gajendragadkar, Wexford Health Sources, Inc., Jim Rubenstein, Charlene Sotak, and David Ballard (ECF Nos. 131, 133 and 136), and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the

34

Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), the Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Synder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties and Judge Faber.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and counsel of record.

| | |
|---|---|
| September 16, 2011 | *Mary E. Stanley* |
| Date | Mary E. Stanley |
| | United States Magistrate Judge |